IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| LAMBDA NU ASSOCIATION OF PHI GAMMA DELTA, INC., and THE LAMBDA NU CHAPTER OF THE PHI GAMMA DELTA FRATERNITY, | |
| Plaintiffs, | 4:22-CV-3023 |
| vs. | MEMORANDUM AND ORDER |
| RONNIE D. GREEN, in his Individual and Official Capacities, et al., | |
| Defendants. | |

This matter is before the Court on the defendants' motion to dismiss (filing 15) the plaintiffs' operative amended complaint (filing 12) pursuant to Fed. R. Civ. P. 12(b)(1) and (6). For the reasons outlined below, the Court will grant this motion.

## I. BACKGROUND

The Lambda Nu Chapter of the Phi Gamma Delta Fraternity (the "Chapter") is a fraternal society, formerly recognized as a student organization at the University of Nebraska-Lincoln. Filing 12 at 4. Members of the Chapter were provided housing by the Lambda Nu Association of Phi Gamma Delta, Inc. (the "Housing Corporation"), a business entity incorporated under Nebraska law. Filing 12 at 4. The Chapter also has a national affiliate corporation (the "National Organization"). See filing 12 at 4. The current action, which was brought by the Chapter and the Housing Corporation, allegedly arose as follows.

On January 21, 2017, there was a "Women's March" in Lincoln, Nebraska, which involved thousands of demonstrators marching to express opposition to President Donald Trump's recent inauguration. Filing 12 at 6. During the march, the Chapter's house displayed signs expressing support for President Trump, and various members of the Chapter "conducted their own political demonstration on the Chapter House's front lawn." Filing 12 at 6. This involved members chanting "Trump, Trump, Trump," and other slogans associated with the then-president. Filing 12 at 6-7.

That evening, participants of the Women's March allegedly lodged complaints with the university about the Chapter's political demonstration and demanded an investigation into whether this conduct violated the university's Title IX policies. Filing 12 at 7. On January 26, 2017, the plaintiffs were informed by the university's Title IX Coordinator that the university had initiated an investigation into the Chapter. Filing 12 at 7. And days later, on January 31, 2017, university officials met with representatives from the Housing Corporation and the National Organization. Filing 12 at 7-8.

During this meeting, Vice Chancellor Juan Franco allegedly stated that "he had already decided the Chapter should be suspended for between 3 and 4 years, based on the Chapter's members' speech during the Women's March." Filing 12 at 7-8. On February 7, 2017, Vice Chancellor Franco addressed the pending investigation in a press release, announcing that the Chapter was "on interim suspension as an investigation into a pattern of behavior within the chapter continue[d]." Filing 12 at 8. And while he acknowledged that the members' demonstration during the Women's March was the impetus for the investigation, he also noted that the investigation uncovered "broader conduct issues at the fraternity" which required "immediate action" while the investigation continued. Filing 12 at 8.

On March 21, 2017, the university, the National Organization, and the Housing Corporation  agreed to a "Chapter Rehabilitation Plan" to address "disputes with the University." Filing 12 at 8. According to the Rehabilitation Plan, of "primary concern to the chapter are hazing, parties/social gatherings hosted off-campus, with alcoholic beverages being provided to minors, occurring at locations other than establishments properly licensed to sell and serve alcoholic beverages." Filing 12 at 8. At that time, the Chapter was formally suspended until May 2020. Filing 12 at 22.

According to the plaintiffs, the Rehabilitation Plan did not make any reference to the Chapter members' conduct during the Women's March or the pending Title IX investigation. Filing 12 at 8. However, the university's subsequent press release allegedly portrayed the motivation for the Chapter's suspension much differently. Filing 12 at 9. Though the university mentioned reckless alcohol use and hazing, it also accused the Chapter of a pattern of "inappropriate sexually based behavior." Filing 12 at 9. And in specific reference to the Women's March, it noted: "While not the focal point of the suspension, comments made by [the Chapter's] members Jan. 21 outside the fraternity . . . were consistent with the pattern of sexually harassing conduct evident in multiple other incidents." Filing 12 at 9. According to the complaint, this investigation and the "violations" uncovered were "pretext for unconstitutional viewpoint-based discrimination" based on the members' pro-Trump speech. Filing 12 at 22.

In Spring 2019, the university allegedly terminated the Chapter's suspension early. Filing 1 at 9. And while the Chapter understood itself to be a fully-recognized student organization not under any suspension or disciplinary supervision by January 1, 2021, the plaintiffs contend that the university continued to retaliate against them after this time. Filing 1 at 9.

Just weeks later, on February 17, 2021, the university notified the Chapter that the University of Nebraska-Lincoln Police Department (the "UNLPD") reported conduct occurring at the Chapter's house that violated the Student Code of Conduct. Filing 12 at 9-10. The alleged violations included: (1) possession or consumption of alcohol by underage individuals, (2) making alcoholic beverages available or easily accessible to underage individuals, and (3) failure to follow COVID-19 protocols for social gatherings. Filing 12 at 10. And on March 5, the Student Conduct Office (the "SCO"), working at the direction of Andrea Barefield, Director of Conduct and Community Standards, held an informal hearing on these accusations that was attended by an undergraduate representative for the Chapter, the Chapter's attorney, and the National Organization. Filing 12 at 10. It was revealed at the hearing that UNLPD officers allegedly "witnessed, through a basement egress window, Chapter members listening to loud music and drinking alcohol." Filing 12 at 10.

At the end of the hearing, an unnamed SCO representative allegedly told the National Organization's representative that the university "would likely levy a sanction that would place the Chapter on a 'probation' lasting through the end of the Spring 2021 semester." Filing 1 at 10. But during a follow-up conversation between the two the next week, the SCO representative allegedly revealed that his supervisor believed the Chapter was a "bad fraternity" and should receive an enhanced penalty because of "events associated with the 2017 Women's March." Filing 12 at 11. Subsequently, the university proposed an "administrative resolution," which would settle the charges if the Chapter agreed to be placed on probation until December 18, 2021. Filing 12 at 11. The Chapter rejected this offer.

4

At a formal hearing on May 27, 2021, a UNLPD officer testified that he personally witnessed alcohol and was also able to infer from his training and experience that alcohol consumption was occurring at the Chapter house. Filing 12 at 11-12. And in a letter dated June 2, the university informed the Chapter of its decision that the Chapter had violated the Student Code of Conduct as alleged and would be placed on probation until December 18, 2021. Filing 12 at 12.

On August 24, 2021, while the Chapter was still on this probation, information began circulating on social media that a university freshman had been sexually assaulted at the Chapter house the previous evening. Filing 12 at 13. According to the plaintiffs, these are unsubstantial rumors. Filing 12 at 13. That same day, UNLPD posted on its website that it was investigating the "SEX OFFENSE-RAPE" that allegedly occurred at the Chapter house. Filing 12 at 13. And by that evening, hundreds of demonstrators had gathered in front of the Chapter house based on their "belief in the unverified rumors." Filing 12 at 13.

On August 25, 2021, Chancellor Ronnie Green tweeted in response to the incident. Filing 12 at 13. And the following day, Chancellor Green issued another statement related to the incident. Filing 12 at 14. On August 31, the SCO formally notified the Chapter that it was accused of violating the Student Code of Conduct based on UNLPD reports of incidents that had occurred August 23. Filing 12 at 15. The alleged violations included: (1) several violations for the misuse of alcoholic beverages, (2) engaging in, or attempting to engage in, behavior that may cause harm to an individual or property, and (3) failure to comply with discipline imposed under the Student Conduct Code. Filing 12 at 16.

A formal hearing took place on September 17, 2021, and UNLPD officers testified that, on the evening in question, they responded to reports of a party at the Chapter's house. Filing 12 at 16. And during interviews with Chapter members and non-members, they learned that two parties took place that evening—one off-campus co-hosted by the Chapter and another fraternity, and a subsequent party at the Chapter house. Filing 12 at 16-17. Ultimately, the Student Conduct Board found that the Chapter "was guilty of all charges" except for engaging in, or attempting to engage in, behavior that may cause harm to an individual or property. Filing 12 at 17. Around this time, the Chapter's charter was suspended by the National Organization. Filing 12 at 19.

On October 12, 2021, Chancellor Green issued a statement that the University Conduct Board had "determined that violations of the Student Code of Conduct did occur," the Chapter was suspended through 2026, and during that time, the fraternity would "no longer [be] recognized by the university." Filing 12 at 18. Chancellor Green also noted that a separate criminal investigation into the sexual assault by UNLPD was still ongoing. Filing 12 at 18. But according to the plaintiffs, no one has been charged, either criminally or under the Student Code of Conduct, with sexual assault in connection to the August 23, 2021, events. Filing 12 at 19.

The plaintiffs' complaint alleges that the disciplinary actions against them by Chancellor Green and Director Barefield were unconstitutional and have brought five claims under 42 U.S.C. § 1983. In their first two claims, the Chapter alleges that Chancellor Green and Director Barefield's conduct violated their First Amendment rights to freedom of speech and freedom of association. Filing 12 at 22-26. Specifically, the Chapter alleges that Chancellor Green's decision to broadly "investigate" the Chapter after the

Women's March and ultimately issue the March 2017 suspension was a "pretext for unconstitutional viewpoint-based discrimination." Filing 12 at 22-23. Additionally, the Chapter alleges that this political speech "played a part or a role" in Chancellor Green and Director Barefield's decision to issue the October 2021 suspension and revoke the Chapter's status as a recognized student organization. Filing 12 at 23.

Third and fourth, each plaintiff brought a Fourteenth Amendment claim against Chancellor Green, alleging that he "made stigmatizing statements" that untruthfully insinuated the plaintiffs were punished for or guilty of crimes of moral turpitude in violation of their due process rights. Filing 12 at 28. Finally, the plaintiffs seek a declaratory judgment and prospective injunctive relief against Chancellor Green and Director Barefield under the Federal Declaratory Judgment Act, finding that the defendants violated their constitutional rights and directing reinstatement of the Chapter as a recognized student organization. Filing 12 at 31.

In response, the defendants have filed a motion to dismiss. Filing 15. The defendants argue: (1) the official capacity claims against them are barred by sovereign immunity, (2) the statute of limitations bars some of the plaintiffs' claims; and (3) the plaintiffs have failed to state a claim for relief under the First or Fourteenth Amendment. *See* filing 16.

## II. STANDARD OF REVIEW

A complaint must set forth a short and plain statement of the claim showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2). This standard does not require detailed factual allegations, but it demands more than an unadorned accusation. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The complaint need not contain detailed factual allegations, but must provide more than labels and conclusions; and a formulaic recitation of the elements of a

cause of action will not suffice. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). For the purposes of a motion to dismiss a court must take all of the factual allegations in the complaint as true, but is not bound to accept as true a legal conclusion couched as a factual allegation. *Id.*

And to survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must also contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. *Iqbal,* 556 U.S. at 678. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but has not shown—that the pleader is entitled to relief. *Id.* at 679.

Determining whether a complaint states a plausible claim for relief will require the reviewing court to draw on its judicial experience and common sense. *Id.* The facts alleged must raise a reasonable expectation that discovery will reveal evidence to substantiate the necessary elements of the plaintiff's claim. *See Twombly*, 550 U.S. at 545. The court must assume the truth of the plaintiff's factual allegations, and a well-pleaded complaint may proceed, even if it strikes a savvy judge that actual proof of those facts is improbable, and that recovery is very remote and unlikely. *Id.* at 556.

A motion pursuant to Fed. R. Civ. P. 12(b)(1) challenges whether the court has subject matter jurisdiction. The party asserting subject matter jurisdiction bears the burden of proof. *Great Rivers Habitat All. v. FEMA*, 615 F.3d 985, 988 (8th Cir. 2010). Rule 12(b)(1) motions can be decided in three ways: at the pleading stage, like a Rule 12(b)(6) motion; on undisputed facts, like a summary judgment motion; and on disputed facts. *Jessie v. Potter*, 516 F.3d 709, 712 (8th Cir. 2008). Overall, the court has "substantial" authority to

determine whether it has jurisdiction. *Osborn v. United States*, 918 F.2d 724, 730 (8th Cir. 1990).

## III. DISCUSSION

### 1. ELEVENTH AMENDMENT IMMUNITY

First, the defendants argue that any claims *for damages* made against them in their *official capacities* should be dismissed, as state officials are "entitled to state sovereign immunity under the Eleventh Amenemhet." Filing 16 at 16-17. In response, the plaintiffs contend that such Eleventh Amendment immunity does not bar their official-capacity claims to the extent they seek prospective injunctive relief. *See* filing 24 at 10-13. But these positions are not antithetical. However, to ensure there is no confusion, the Court will briefly address the permissible scope of the plaintiffs' official-capacity claims.

The sovereign immunity enjoyed by states and recognized in the Eleventh Amendment bars private parties from bringing actions for damages against unconsenting states in federal courts. *Thomas v. St. Louis Bd. of Police Comm'rs*, 447 F.3d 1082, 1084 (8th Cir. 2006) (citing *Becker v. Univ. of Neb.*, 191 F.3d 904, 908 (8th Cir. 1999)). And the immunity provided by the Eleventh Amendment extends to State officials acting in their official capacity. *See Hafer v. Melo*, 502 U.S. 21, 25 (1991). But the amendment does not automatically divest the federal courts of jurisdiction. *United States v. Metro. St. Louis Sewer Dist.*, 578 F3d 722, 724-25 (8th Cir. 2009).

In fact, while the Eleventh Amendment bars an award of damages against a State in a § 1983 action, the doctrine set forth in *Ex Parte Young*, 209 U.S. 123 (1908), permits State officials to be sued in federal court for prospective injunctive relief when the plaintiff alleges the officials are acting in violation of the Constitution or federal law. *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 269-70 (1997); *Monroe v. Ark. State Univ.*, 495 F.3d 591,

9

594 (8th Cir. 2007). Additionally, a federal court may award attorney's fees and other costs against the State under § 1988 as part of any prospective injunctive relief awarded in a § 1983 action. *El-Tabech v. Clarke*, 616 F.3d 834, 837 (8th Cir. 2010).

In this way, both parties are correct. Claims I and II of the plaintiffs' complaint are brought against the defendants in their individual and official capacities. *See* filing 12 at 24-25. And for these claims the plaintiffs seek "compensatory, nominal, and punitive damages" as well as prospective injunctive relief, including attorney's fees and costs. Filing 12 at 24-25. To the extent these claims seek monetary damages against the defendants in their official capacities, such claims are barred by the Eleventh Amendment. However, the plaintiffs' claims against the defendants in their official capacities will not be dismissed outright, as the plaintiff can recover prospective injunctive relief against these defendants if the claims are otherwise properly stated.

## 2. CONSTITUTIONAL CLAIMS

The plaintiffs brought this action under § 1983 alleging that the defendants' conduct violated their First and Fourteenth Amendment rights. *See* filing 12 at 3. "The essential elements of a § 1983 claim are (1) that the defendant(s) acted under color of state law, and (2) that the alleged wrongful conduct deprived the plaintiff of a constitutionally protected federal right." *Schmidt v. City of Bella Villa*, 557 F.3d 564, 571 (8th Cir. 2009) (citing *DuBose v. Kelly*, 187 F.3d 999, 1002 (8th Cir. 1999)). Since there is no dispute that Chancellor Green and Director Barefield acted under the color of state law, the Court will evaluate whether the plaintiffs have alleged sufficient facts to reasonably infer the defendants' conduct violated their rights under the First and Fourteenth Amendments.

(a) First Amendment - Freedom of Speech (Retaliation)

First, the Chapter claims Chancellor Green and Director Barefield violated the Free Speech Clause of the First Amendment by punishing the Chapter and its members in retaliation for their protected political speech during the 2017 Women's March. *See* filing 12 at 22-23. Specifically, the Chapter alleges two retaliatory incidents based on this protected speech: (1) Chancellor Green retaliated against the Chapter in March 2017 when university officials investigated and ultimately suspended the Chapter as "pretext for unconstitutional viewpoint-based discrimination" (the "2017 retaliation claim"); and (2) this protected speech "played a part or a role" in Chancellor Green and Director Barefield's decision to revoke the Chapter's status as a student organization in October 2021 (the "2021 retaliation claim"). *See* filing 12 ¶¶ 75-76. In response, the defendants argue that the Chapter's 2017 retaliation claim is barred by the statute of limitations, and that both claims are insufficiently pled. *See* filing 16 at 18-25.

*(i) 2017 Retaliation Claim - Statute of Limitations*

The defendants' statute of limitations argument is straightforward—the Chapter's 2017 retaliation claim is barred because it accrued more than four years before the plaintiffs filed their complaint. *See* filing 16 at 20-21. Section 1983 does not contain its own statute of limitations. *Walker v. Barrett*, 650 F.3d 1198, 1205 (8th Cir. 2011). Instead, the Supreme Court has held that § 1983 claims are governed by the personal injury statute of limitations of the state where the claim accrued. *Id.* at 1205 (citing *Wilson v. Garcia*, 471 U.S. 261, 279-80 (1985)). Under Nebraska law, a personal injury action must be brought within four years from the date on which the action accrued. Neb. Rev. Stat. § 25-207; *Anthony K. v. Neb. Dep't of Health and Human Servs.*, 855 N.W.2d 788, 799 (Neb. 2014).

But when a § 1983 claim accrues is a question of federal law. *Rassier v. Sanner*, 996 F.3d 832, 836 (8th Cir. 2021). And it is a "standard rule that accrual occurs when the plaintiff has a complete and present cause of action." *Id*. (cleaned up). Thus, "[r]etaliation claims generally accrue when the retaliatory action occurs." *Id.* Finally, the statute of limitations defense is "an affirmative defense, which the defendant must plead and prove." *Walker*, 650 F.3d at 1203. Thus, even if a statute of limitations defense exists, this defense "is not ordinarily a ground for Rule 12(b)(6) dismissal unless the complaint itself establishes the defens*e*." *Joyce v. Teasdale*, 635 F.3d 364, 367 (8th Cir. 2011).

The facts alleged in the plaintiffs' complaint establish that the Chapter's 2017 retaliation claim accrued, at the latest, in March 2017. *See* filing 12 at ¶ 75. To establish a First Amendment retaliation claim, the Chapter must show (1) that it engaged in a constitutionally protected activity; (2) that the defendants took adverse action against it that would chill a person of ordinary firmness from continuing in the activity; and (3) that the adverse action was motivated in part by the Chapter's exercise of its constitutional rights. *Scheffler v. Molin*, 743 F.3d 619, 621 (8th Cir. 2014). And the Chapter alleged that (1) its members engaged in protected political speech during the Women's March, (2) the university initiated an investigation against it on January 26, 2017, "in retaliation to " this speech, and (3) on March 21, 2017, the Chapter was suspended as a result of this pretextual investigation. Filing 12 at 6-7.

Thus, the Chapter had a complete and present cause of action, at the very latest, in March 2017, when the allegedly retaliatory suspension occurred.[1] And since the plaintiffs' original complaint was not filed until

---

[1] It is possible the claim actually accrued on January 26, 2017, when the first retaliatory act—the pretextual investigation—allegedly occurred. At that point, the Chapter arguably

February 2022, *see* filing 1, claims based on this conduct were untimely under the four-year statute of limitations. And the Chapter does not directly dispute this conclusion. Instead, it argues that the 2017 retaliation claim is timely under the "continuing violation theory," as it was part of "a pattern of conduct . . . designed to perpetually punish the Chapter." Filing 24 at 21-22. Additionally, the Chapter argues the statute of limitations was tolled under Neb. Rev. Stat. § 25-213. *See* filing 24 at 23-24.

First, for several reasons, the Chapter has failed to sufficiently allege that its 2017 retaliation claim is part of a continuing violation. The continuing violation doctrine is a narrow, equitable exception to timely filing requirements imposed by a statute of limitations. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002). The doctrine allows a plaintiff to avoid the running of a statute of limitations for claims involving a pattern or practice of discrimination, as long as at least one incident of discrimination occurred within the limitations period. *Taxi Connection v. Dakota, Minn. & E. R.R. Corp.*, 513 F.3d 823, 825 (8th Cir. 2008) (citations omitted). Thus, when the doctrine applies, conduct that occurred outside of the limitations period can be used to establish liability.

The Supreme Court has outlined the parameters of the doctrine. First, while it may save otherwise untimely claims that *were not individually actionable*, it does "convert[] related discrete acts into a single unlawful practice for the purposes of timely filing." *Morgan*, 536 U.S. at 111; *see Taxi*

_____

had a complete and present cause of action. And the subsequent suspension that stemmed from the retaliatory investigation may be more appropriately characterized as an inevitable consequence of the unlawful retaliation. *See Tademe v. Saint Cloud State Univ.,* 328 F.3d 982, 988 (8th Cir. 2003). But regardless of whether the claim accrued in January 2017 or March 2017, the plaintiffs' claim was untimely.

*Connection*, 513 F.3d at 825. In other words, "discrete acts that fall within the statutory time period do not make timely acts that fall outside the time period." *Morgan*, 536 U.S. at 112. Discrete acts are those that can be said to occur on a particular day and are singularly actionable. *See id.*; *Montin v. Est. of Johnson*, 636 F.3d 409, 415 (8th Cir. 2011). Courts have consistently found retaliation to be a discrete act. *See Liles v. C.S. McCrossan, Inc.*, 851 F.3d 810, 821 (8th Cir. 2017); *Myers v. Cnty. of Somerset*, 515 F. Supp. 2d 492, 501 n.1 (D.N.J. June 11, 2007), *aff'd*, 293 F. App'x 915 (3d Cir. 2008).

Additionally, though "[c]ourts may evaluate whether it would be proper to apply such doctrines . . . they are to be applied sparingly." *Morgan*, 536 U.S. at 113. In accordance with this guidance, the Eighth Circuit has limited use of the doctrine to claims "where it is appropriate to describe each new day under an objected-to policy as comprising a new or continuing violation of rights, as in the context of an Eighth Amendment claim for cruel or unusual punishment or a discrimination claim alleging ongoing implementation of a discriminatory wage scheme." *Montin*, 636 F.3d at 415.

Here, the Chapter has not alleged the type of ongoing conduct that would support a continuing violation, but instead, has alleged two discrete, albeit related, acts of retaliation that are subject to two separate limitation periods. As demonstrated above, the Chapter's 2017 retaliation claim involves a discrete violation—it was complete and singularly actionable when the Chapter was allegedly investigated and suspended because of its protected speech. And the continuing violation doctrine will not relieve the Chapter of its duty to diligently pursue this claim simply because a related, but discrete, act of retaliation allegedly occurred within the limitations period. *See Morgan*, 536 U.S. at 111.

14

Specifically, the Chapter alleges that more than four years later, on June 2, 2021, it was placed on an "enhanced" probationary period by the SCO because of its protected speech during the Women's March. *See* filing 12 at 32. And it says that if it wouldn't have been on this probation in October 2021, the defendants would have had no basis to revoke its status as a recognized student organization. *See* filing 12 at 22-23. Thus, the Chapter's continuing violation argument relies on the conclusion that the university's March 2017 suspension decision and June 2021 probation decision were part of a single unlawful practice. *See Morgan*, 536 U.S. at 111. But defendants' alleged decision to levy an enhanced punishment against the Chapter because of its speech also constitutes a discrete act of retaliation, as it is independently wrongful and singularly actionable without relying on the defendants' allegedly wrongful conduct in 2017. *See Ervine v. Desert View Reg'l Med. Ctr. Holdings, LLC*, 753 F.3d 862, 870 (9th Cir. 2014).

And the fact that these discrete, retaliatory acts were allegedly motivated by the same protected speech does not convert them into a continuing violation, especially when the Chapter failed to allege with any specificity how the defendants continued to engage in related retaliatory conduct in the years separating these discrete acts. *See Treanor v. MCI Telecommunications Corp.*, 200 F.3d 570, 574 (8th Cir. 2000); filing 12 at 9. Therefore, since the Chapter's 2017 retaliation claim is not part of a continuing violation, it is barred by the statute of limitations.

This conclusion is also not avoided by the Chapter's argument that the statute of limitations was tolled. Filing 24 at 23-24. Specifically, the Chapter argues that it brought the 2017 retaliation claim to recover both for its own injuries *and* on behalf of its members. *See* filing 24 at 23-24. And since many of its members were twenty years of age or younger when the claim accrued, it

plead sufficient facts to establish that the statute of limitations was tolled, at least for some of its members, under Neb. Rev. Stat. § 25-213. *See* filing 24 at 24. The Court finds this argument unpersuasive.

An association may have "representational standing" to bring claims as the representative of its members in addition to its own standing to seek judicial relief from injuries to the association. *Carson v. Pierce*, 719 F.2d 931, 933-34 (8th Cir. 1983). For an association to have representational standing, it must establish that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.* at 934 (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

Additionally, for § 1983 claims, the applicable tolling statutes are determined by the law of the state where the claims arose. *Crozier for A.C. v. Westside Cmty. Sch. Dist.*, 973 F.3d 882, 888 (8th Cir. 2020). Under Nebraska law, "if a plaintiff is a minor at the time a cause of action accrues, the statute of limitations is tolled until the plaintiff reaches the age of 21." *Id.* (citing Neb. Rev. Stat. § 25-213). This tolling statute applies when a minor's claim is raised by a representative acting as "next friend." *See Macku By & Through Macku v. Drackett Prod. Co.*, 343 N.W.2d 58, 62 (Neb. 1984). However, since the tolling statute "*exists for the exclusive and personal benefit*" of the minor, it does not toll the statute of limitations "of any parental claim associated with [the minor's] separate and personal claim." *Id.* (emphasis added).

According to the Chapter, *Macku* is "inapposite" to the facts here because it is seeking relief for harm to its members, not just harm to the association. Filing 24 at 23-24. First, the Chapter is correct: if associational standing is

16

established, it would be authorized to bring claims for relief on behalf of its members. But although the Court agrees that such claims would be different from the parental claims in *Macku*—that were entirely separate from the minor's personal claims—it is not convinced that the representational standing available to associations is analogous to raising a claim on behalf of a minor as next friend for purposes of applying the minority tolling statute.

In cases involving "next friend" representational standing, *the minor* is raising *his or her personal claims* by and through the next friend. Therefore, suspending the statute of limitations in such circumstances furthers the goal of preserving the "infant's cause of action." *Macku*, 343 N.W.2d at 62. Conversely, associational standing is based on the premise that the individual participation of the association's members is not necessary. *See Carson*, 719 F.2d at 933-34. Collective injury to the association's membership is what drives standing, as opposed to empowering the association to pursue its members' separate and personal claims. Thus, members typically must be part of an action to personally assert claims for damages. *See Hunt*, 432 U.S. at 343-44.

Where a minor is raising a personal claim, application of the minority tolling statute is paramount to preserve his or her independent causes of action. For example, if a member of the Chapter, who was a minor when the 2017 retaliation accrued, brought a personal action for damages against the defendants—either individually or through a party acting as next friend— Nebraska's minority tolling statute *would* apply.[2] As in *Macku*, applying the tolling statute in these circumstances would ensure the tolling statute is used for "the exclusive and personal benefit of the minor." *Macku*, 343 N.W.2d at 62.

---

[2] And the Court's conclusion that the Chapter's associational claims on behalf of its members are time-barred would not prevent a member from doing so.

17

The Court determines, however, that tolling the statute of limitations in the instant case would extend Nebraska's minority tolling statute and the holding in *Macku* beyond their intended bounds. No disability prevented the Chapter from bringing the 2017 retaliation claim on its own behalf, and on behalf of its members—including its minor members—within the limitations period. The fact that it failed to diligently pursue this claim does not entitle it to depend on associational standing—and thereby pursue untimely claims germane to its interests—by invoking a tolling statute that exists for the *exclusive* and *personal* benefit of an aggrieved minor. And where the plaintiff has failed to point to any caselaw extending the Nebraska minority tolling statute to associational claims in this way, the Court is not inclined to do so. For those reasons, the Court finds that the Chapter's 2017 retaliation claim is barred by the statute of limitations.

### *(ii) 2021 Retaliation Claim*

As outlined above, the Chapter's 2021 retaliation claim is a discrete claim that was timely filed. Still, the Court must address the defendants' argument that the Chapter has failed to sufficiently state this claim. *See* filing 27 at 5-8, 11. Again, to establish a First Amendment retaliation claim, the Chapter must show that (1) it engaged in a constitutionally protected activity; (2) the defendants took adverse action against it that would chill a person of ordinary firmness from continuing in the activity; and (3) the adverse action was motivated in part by the Chapter's exercise of its constitutional rights. *Scheffler*, 743 F.3d at 621.

First, the defendants contend that the plaintiffs' amended complaint fails to identify any specific protected conduct that was the basis for retaliation. *See* filing 16 at 23. The Court disagrees. One of the major purposes of the First Amendment is to protect the free discussion of governmental affairs, including

18

candidates for public office. *See McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995). Here, the Chapter alleged that its members chanted "Trump, Trump, Trump," and other slogans associated with the then-president. *See* filing 12 at 6. At this stage, that is sufficient to infer the members' demonstration and speech during the Women's March was protected by the First Amendment.

Next, the defendants argue that the Chapter failed to allege facts from which the Court could plausibly infer that the university's disciplinary actions in 2021 were motivated in any way by this speech. *See* filing 16 at 24. Specifically, the defendants argue that the lack of temporal proximity between the protected speech and the allegedly retaliatory discipline, combined with the obvious and lawful alternative reasons for the disciplinary decisions, prevent the Chapter from stating a plausible retaliation claim. *See* filing 16 at 24. The Court agrees.

A plaintiff "can establish a causal connection between his [protected conduct] and an adverse action through circumstantial evidence, such as the timing of the two events." *Wilson v. Ark. Dep't of Hum. Servs.*, 850 F.3d 368, 373 (8th Cir. 2017). And while causal connection is generally a jury question, "some pleadings may allege a temporal gap so attenuated as to not meet the plausibility standard for surviving motions to dismiss." *Id.* at 373. Citizens seeking "relief from valid adverse regulatory action on the ground that it was unconstitutional retaliation" must make a stronger showing of causation—that the government discriminatorily singled them out for punishment based on exercise of their first amendment right to free speech. *Osborne v. Grussing*, 477 F.3d 1002, 1006 (8th Cir. 2007). And lawful, obvious, alternative explanations for the allegedly retaliatory conduct may render a complaint implausible—

19

even under relaxed pleading standards—if they are sufficiently convincing. *Wilson*, 850 F.3d at 373.

To assess whether a causal connection between the protected speech and adverse action has been sufficiently pled, the Court must first clarify which disciplinary act is the basis for the Chapter's 2021 retaliation claim. According to the complaint, the members' speech during the Women's March "played a part" in the defendants' October 2021 decision to suspend the Chapter for five years and revoke its status as a student organization. Filing 12 at 23. But the Chapter's theory of liability—that had its punishment not been enhanced in June 2021 in retaliation for its protected speech, it would not have been on probation and subject to this five-year suspension—demonstrates that the disciplinary action in October 2021 was a delayed *consequence* of a prior retaliatory act. *See Treanor*, 200 F.3d at 574; *Ervine*, 753 F.3d at 870.[3] And since this decision was a mere consequence—as opposed to an discrete,

---

[3] This conclusion is supported by the fact that the complaint is void of allegations supporting the inference that the Fall 2021 investigation or suspension were discrete, retaliatory acts. According to the complaint, this investigation began after (1) UNLPD received reports that a rape allegedly occurred at the Chapter house, and (2) the university received reports of multiple parties hosted by the Chapter that same evening that involved underage drinking. Filing 12 at 16-17. The Chapter also conceded that various members provided testimony about these parties to university officials, and that the university took disciplinary action against other fraternities involved with these events. *See* filing 12 at 19. Thus, despite its conclusory claim that the Fall 2021 suspension decision was "a mere pretext," filing 12 at 25, the Chapter simply does not allege any facts supporting the inference that the investigation and disciplinary action during the Fall 2021 semester were discrete, independently wrongful acts done in retaliation for the members' protected speech, and such a conclusion is consistent with the theory of liability the Chapter advances throughout its complaint and arguments. *See* filing 12 at 26; filing 24 at 21-22.

retaliatory act—the Court must determine whether the Chapter has sufficiently pled a causal connection between its protected speech and the allegedly retaliatory suspension decision in June 2021.

The Chapter argues that the SCO's decision to put the Chapter on probation until December 18, 2021—instead of until the end of the Spring semester as originally suggested at an informal hearing—along with statements from a SCO representative that his supervisor believed the Chapter was a "bad fraternity" that should receive an enhanced penalty because of its conduct during the Women's March, support the reasonable inference that the Chapter was penalized in retaliation for its protected speech. The Court disagrees. Despite the liberal pleading standard, the Court finds this to be a case where the circumstantial evidence linking the protected speech and the allegedly retaliatory act is so attenuated that the plausibility standard is not met. *See Wilson,* 850 F.3d at 373. Although the Chapter is not required to make out a *prima facie* case at this stage, the allegations in the complaint do not allow the Court to infer more than a *mere* (even slight) *possibility* of unconstitutional retaliation in regards to the June 2021 decision. *See Morton v. Becker,* 793 F.2d 185, 187 (8th Cir. 1986).

And this is all that can be established when the allegations cherry-picked by the Chapter are considered in light of *all* the facts alleged. First, it is important to note that the Chapter does not allege the SCO's conclusion in June 2021—that its members violated the university's alcohol policies—was erroneous. In fact, in stark contrast to its 2017 retaliation claim, the Chapter does not allege that the investigation or violations found by the university at this time were pretext for viewpoint discrimination. [4] *See* filing 12 at 22-23.

---

[4] Although the Chapter implies that some of the evidence against it was questionable, it does not claim that these violations were unfounded, that its members did not engage in the

And although the Chapter alleges that it was given a longer probationary period than originally alluded to at the *informal* hearing, it made no allegations that the six-month probation term imposed was a longer punishment than those imposed on other social organizations that similarly violated the university's policies. Additionally, the Chapter ignores the fact that it would have been impossible for the university to impose the "likely" punishment allegedly suggested at the informal hearing since the university did not complete the formal hearing and reach a final decision on the alleged violations until June 2021, after the Spring semester had already concluded. *See* filing 12 at 12.

In the instant case, the obvious, lawful alternative explanation for the probation term imposed is *sufficiently convincing. See* filing 16-3 at 1. And in turn, the Chapter's threadbare allegations are insufficient to state a plausible retaliation claim, especially considering the protected speech occurred more than four years before the allegedly retaliatory conduct. As such, the Chapter's 2021 retaliation claim will be dismissed.

### (b)    First Amendment - Freedom of Association

Next, the defendants argue that the Chapter has failed to state a First Amendment freedom of association claim because (1) fraternities are primarily

---

conduct, or that the accusations were based on rumors, as it does with other accusations. In fact, the Chapter notes that it rejected the university's proposed administrative resolution as to these violations because of the proposed severity of the enhanced punishment, not because the violations were unfounded. *See* filing 24 at 20. And in the university's formal disciplinary decision—the legitimacy of which the plaintiffs' do not contest—it is noted that an underage student who left the Chapter house that evening was taken to a detox facility and an internal investigation *conducted by the fraternity itself* found freshman were involved in the incident. *See* filing 16-3 at 1.

social organizations that are not entitled to the First Amendment protections guaranteed to expressive associations, and (2) the Chapter's association claim is simply a "repackaged version of its retaliation claims," which it failed to state. *See* filing 27 at 14. Though the Court does not necessarily agree with the defendants' reasoning in its entirety, it agrees with their ultimate conclusion—the plaintiff has failed to state a freedom of association claim.

The First Amendment protects "the right of individuals to associate to further their personal beliefs." *Healy v. James*, 408 U.S. 169, 181 (1972). And the Supreme Court has recognized "two types of protected associational rights: the right 'to enter into and maintain certain intimate human relationships' and the 'right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion.'" *Royer v. City of Oak Grove*, 374 F.3d 685, 688 (8th Cir. 2004) (quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 618 (1984)). Here, the Chapter concedes that it is not an intimate association. *See* filing 24 at 26. Instead, its claim falls in the latter category: the university's retaliatory decision to withdraw the Chapter as a recognized student organization deprived it of its First Amendment right to freely associate and engage in expressive conduct. *See* filing 12 at 24; filing 24 at 26.

While "[t]he right to associate for expressive purposes is not . . . absolute," *Roberts*, 468 U.S. at 623, "[t]here can be no doubt that denial of official recognition, *without justification*, to college organizations burdens or abridges that associational right," *Healy*, 408 U.S. at 181. But "[i]nfringements on that right may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Roberts*, 468 U.S. at 623. And in a school environment, "the power of the

23

government to prohibit 'lawless action' is not limited to acts of a criminal nature." *Healy*, 408 U.S. at 189. In fact, the Supreme Court has recognized that colleges have an "inherent power" to promulgate rules and regulations, and discipline students who fail to adhere to generally accepted standards of conduct. *See id.* at 192. Therefore, "[a]ssociational activities need not be tolerated where they infringe reasonable campus rules." *Id.* at 189.

The Court need not address whether the Chapter was an expressive association for purposes of the First Amendment. Regardless, its claim fails. Denial of official recognition, *without justification*, burdens associational rights. However, as stated above, the Chapter has failed to plausibly allege a connection between its protected speech and the university's decision to revoke its recognition as a student organization. Thus, the Court cannot reasonably infer that the university's revocation of the Chapter's status as a student organization was motivated, in any way, by the desire to suppress a "disfavored" viewpoint. *See Roberts*, 468 U.S. at 623. At most, any "protected expression was only *indirectly* affected by the state action (via the sanction imposed on unprotected conduct), [meaning] that no First Amendment violation . . . occurred." *Pi Lambda Phi Fraternity, Inc. v. Univ. of Pittsburgh*, 229 F.3d 435 (8th Cir. 2000) (citing *Arcara v. Cloud Books, Inc.*, 478 U.S. 697 (1986)). Accordingly, the Chapter's First Amendment association claim will be dismissed.

### (c) Fourteenth Amendment - Procedural Due Process

Last, both the Housing Corporation and the Chapter have brought a Fourteenth Amendment due process claim. Specifically, they allege that Chancellor Green's decision to make "stigmatizing statements that insinuated Plaintiffs were guilty of and/or being investigated for and/or had been punished based on sexual assault charges rather than violations of the University's

24

alcohol policy," without providing them an opportunity to demonstrate their innocence, damaged their reputations and interests in business goodwill in violation of the due process clause. *See* filing 12 at 27-28. According to the plaintiffs, they are specifically alleging a "§ 1983 'stigma-plus claim,' the thrust of which stems from Chancellor Green's public comments regarding the Plaintiffs[,] made in the Fall 2021 semester." Filing 24 at 31.

To set forth a procedural due process claim, a plaintiff must establish (1) that he has a protected liberty or property interest, and (2) that the defendant deprived him of that interest without due process of law. *Hall v. Ramsey Cnty.*, 801 F.3d 912, 919 (8th Cir. 2015). But "defamatory publications, regardless of how injurious to the petitioner's reputation, cannot alone form the basis of a section 1983 action." *Morton*, 793 F.2d at 187 (citing *Paul v. Davis*, 424 U.S. 693, 710 (1976)). Instead, to state a cognizable due process claim based on a defamatory publication, "loss of reputation must be coupled with some other tangible element to rise to the level of a protectible property interest." *Zutz v. Nelson*, 601 F.3d 842, 849 (8th Cir. 2010). In this context, property interests are created and defined by state law. *Paul*, 424 U.S. at 709.

Thus, as conceded by the plaintiffs, to establish stigma-plus liability, they must first show that "a state actor made a *stigmatizing statement about the plaintiff*." Filing 24 at 32. And while it is true that government officials accusing a plaintiff of immorality or the like *may* be stigmatizing, to be "sufficiently stigmatizing," the statements must also be "untrue." *Jones v. McNeese*, 746 F.3d 887, 898 (8th Cir. 2014). Here, the plaintiffs have failed to plausibly allege that Chancellor Green made any statements about the Chapter or the Housing Corporation that are capable of being proved false.

On August 25, 2021, Chancellor Green issued a statement after the UNLPD announced it was investigating a rape that allegedly occurred at the

Chapter house.[5] Filing 12 at 13. Though Chancellor Green did mention the Chapter specifically in this statement, the plaintiffs have failed to plausibly allege that any of these statements are capable of being proved false. Specifically, Chancellor Green stated that (1) the allegation of sexual assault was being investigated and taken "very seriously," (2) the Chapter was "currently under probation for previous violations of university policy," and (3) the university was "closing the fraternity house and suspending operations of the [Chapter] while th[e] investigation was ongoing, due to *potential violations of that probation*." Filing 12 at 13.

But according to the plaintiffs' complaint, the UNLPD *was* investigating a rape that allegedly occurred at the Chapter house. *See* filing 12 at 13. And at the time of this investigation, the Chapter *was* on probation for previous violations of university policies. *See* filing 12 at 12.  Still, the plaintiffs contend that these statements were stigmatizing and defamatory because Chancellor Green "withheld the fact that the Chapter's prior probation had nothing to do with sexual misconduct." *See* filing 12 at 13. But the fact that Chancellor Green did not go into detail about the Chapter's probationary status does not make the statement that they *were* on probation untrue, nor can it reasonably be inferred that vaguely referencing the Chapter's probationary status somehow implied that the Chapter was guilty of or responsible for the pending rape allegation. In fact, in refencing the sexual assault allegation, Chancellor Green carefully called it a "potential violation" that was still under investigation, all of which was true. Therefore, it cannot be plausibly inferred that Chancellor

---

[5] Even though the plaintiffs only argue that Chancellor Green's August 26th, 2021, statements were stigmatizing and defamatory, *see* filing 24 at 34-38, to determine if the plaintiffs have stated a claim, the Court will also address the statements made by Chancellor Green the day prior, as they provide important context.

26

Green made any stigmatizing and defamatory statements about the plaintiffs in his August 25th statement.

And the inference that Chancellor Green made defamatory statements— let alone defamatory statements *about the plaintiffs*—in his August 26th, 2021, remarks is even less plausible based on the facts alleged by the plaintiffs. The remarks were as follows:

> Sexual assault is heinous and should never happen. I wish we lived in a world where it didn't.

> We have taken a number of steps on our campus to prevent sexual assault, to help ensure victims feel comfortable coming forward, to support survivors and to investigate and address allegations of sexual misconduct.

> This week, sexual assaults were reported to our UNL Police Department. And they immediately began investigating each of them. My heart breaks at the thought of any young person facing that trauma at the beginning of their collegiate experience, or at any time they are a member of our UNL family.

> I know that our UNL Police Chief, Hassan Ramzah, also takes this very seriously and uses a trauma-informed approach in working with the victims and thoroughly investigating each case as he's doing right now.

27

We all wish that resolution of these cases could come swiftly. But often, it's not as simple as "locking them up." The guarantee of due process is part of our Constitution and core to who we are as Americans.

Our law enforcement officials, our Title IX officials, are bound by clear legal guidance and process. As a university, we have a responsibility to follow that defined process and protect the rights of all involved—even while we move as quickly as we can.

**And I know that the end of that legal process sometimes just doesn't feel like justice. I get that. I understand many of you are angry. I'm angry too.**

We will always work harder and to do better to help prevent sexual assault. And I hope all of you will as well. If you see something, say something. Stick together. Be safe. Take care of one another.

**And if you're a young man who somehow thinks this is cool—think again. It is unacceptable. No means no. And if you violate that, and we can prove it—you have no place on our campus.**

Filing 24 at 35 (emphasis supplied by plaintiffs).

As seen, Chancellor Green first focused on the broad issue of sexual assault by emphasizing the heinousness of the act in general, expressing empathy for victims, and outlining steps the university has taken (and would

28

take) to address the issue on campus. Filing 12 at 13-14. When speaking specifically of the reported assault, Chancellor Green explained that it was reported to UNLPD and was being seriously investigated. Filing 12 at 13-14. And although Chancellor Green empathized with the community's desire for a swift resolution "of these cases," he specifically noted that it is never just as simple as "locking them up." *See* filing 12 at 13-14.

Understandably, the plaintiffs do not specifically argue that these portions of Chancellor Green's statement were stigmatizing or defamatory. Instead they point to the two specific portions of the statement that they emphasized above. *See* filing 12 at 13-14. According to the plaintiffs, the first statement "implied to the world that there was a chance 'the end of that process' would not 'feel like justice,'" thereby insinuating the guilt of those involved. Filing 24 at 26.

But even drawing every *reasonable* inference for the plaintiffs, the Court cannot plausibly infer that Chancellor Green's first statement defamatorily implied the accused—let alone the Chapter or the Housing Corporation—were guilty of or responsible for the alleged sexual assault. Again, context matters. Not one time did Chancellor Green directly reference the accused. And when he did discuss the investigation more specifically, he emphasized the importance of due process and "*protect[ing] the rights of all involved*."

At most, there is a *nibble* (less than a *scintilla*) *of evidence* that Chancellor Green was *possibly* implying guilt *of the accused* when he expressed that the legal process does not always feel like justice. *See* filing 24 at 40. But a factually unsupported[6] possibility does not equal plausibility, even under a

---

[6] The plaintiffs alleged that members of the public reasonably understood this statement to mean exactly what Chancellor Green insinuated. *See* filing 24 at 38. But this is a conclusory allegation that need not be taken as true. And any suggestion that the demonstrations taking

liberal pleading standard. The plaintiffs simply have not stated sufficient facts to plausibly allege that this first statement by Chancellor Green, implicitly or otherwise, made a provably false assertion about them.

And the Court cannot fathom how it could plausibly be inferred that the second statement emphasized by the plaintiffs was defamatory in any way. In a statement about a reported sexual assault addressed to the entire university, Chancellor Green emphasized that sexual assault is not acceptable, that "no means no," and that anyone proven guilty of such offenses has no place on campus. These are statements of opinion on a matter of public concern that are widely accepted by society, and by the plaintiffs. *See* filing 24 at 40. They do not imply guilt of any particular person, nor are they capable of being proved false. *See Nunes v. Lizza*, 12 F.4th 890, 897 (8th Cir. 2021). For these reasons, the plaintiffs' Fourteenth Amendment claims will be dismissed.[7] Accordingly,

IT IS ORDERED:

1.    The defendants' motion to dismiss (filing 15) is granted.

2.    The plaintiffs' complaint is dismissed.

---

place at the Chapter house substantiates this allegation is not supported by the plaintiffs' complaint. The plaintiffs specifically alleged that the demonstrations and death threats were occurring at the Chapter house *before* either of Chancellor Green's statements. *See* filing 12 at 13-14. Thus, it cannot be reasonably inferred that the demonstrations occurred because Chancellor Green's statements insinuated guilt.

[7] Since the plaintiffs have failed to state a constitutional claim, their request for declaratory judgment is also dismissed. *See* filing 12 at 30.

3.      A separate judgment will be entered.


Dated this 27th day of March, 2023.


                              BY THE COURT:


                              _____
                              John M. Gerrard
                              Senior United States District Judge